VILLANTI, Judge.
Worthington Communities, Inc., and Ohio Casualty Insurance Co. appeal the final judgment and amended final judgment entered against them in this personal injury action arising out of a construction accident. On cross-appeal, the Mejias raise a standing argument as to Ohio Casualty and two arguments directed to the judgments. We affirm the final judgment in all respects. While we have carefully considered all of the arguments raised by the parties, we write to address only two issues raised in the direct appeal.
Facts
In 1999, Worthington was developing a condominium project in Fort Myers, Florida. As to that project, Worthington was both the owner of the property and the general contractor in charge of the construction of multiple condominium units.
Worthington contracted with Sunshine Masonry, Inc., for the masonry work on the condominium project. The scope of this work included installing forms and pouring concrete for the structural divisions between the floors of each condominium unit. The project plans called for Sunshine Masonry to use a joist system developed by Hambro Structural Systems to form the floors and ceilings within and between the units. The Hambro joist system required the masonry contractor to place steel joists across the span between the exterior masonry walls. The stability of these joists during construction was ensured by the installation of steel cross members, called rollbars, both around the perimeter of the walls and at designated intervals along the length of the joists. After the rollbars were installed, sheets of plywood were installed as the form on which the concrete would be poured. Wire reinforcement mesh was then placed on the plywood before the concrete was poured. Once the concrete was poured and had cured, the rollbars were removed and the plywood was stripped away, leaving a reinforced poured concrete floor/ceiling.
*82 The bundles of wire mesh used with the Hambro system were large, and each bundle weighed 3700 pounds. Evidence presented at trial established that Hambro’s product literature represented that it was safe to load and store mesh bundles on top of completed masonry walls. The product literature also represented that it was safe to load and store mesh bundles on the steel joists after the rollbars were completely installed. Either of these options was a permissible “staging” technique that allowed the mesh bundles to be accessible for use in an adjoining condominium unit. However, it was not acceptable to load or store mesh bundles on the steel joists before the rollbars were fully installed because the joists were too unstable at that point to support the weight and mass of the mesh bundles. This danger was made clear in both the documentation from Hambro about the joist system and in the general notes on the blueprints for the condominium project.
On Friday, May 14, 1999, Sunshine Masonry used a crane to place steel Hambro joists between the first and second floors of one of the condominium units that was under construction. After the joists were in place but before the rollbars were fully installed, Sunshine Masonry used the crane to place bundles of wire mesh on top of the unbraced joists. The following day, Sunshine Masonry was on site continuing with the installation of the Hambro joist system. Mr. Mejia, who worked for Sunshine Masonry as an unskilled laborer, was working below the unbraced joists that were supporting the mesh bundles. As he did so, the unbraced joist system collapsed and a bundle of wire mesh fell on him. The weight and force of the impact rendered Mr. Mejia a quadriplegic.
The Mejias initially sued numerous entities involved in the construction of the condominium project. However, by the time of trial, the sole claim to be tried was the Mejias’ claim that Worthington was negligent by failing to provide Mr. Mejia with a safe place to work. The Mejias did not allege that Worthington was vicariously liable for the negligence of Sunshine Masonry. Instead, they alleged that Worthington had been actively negligent in causing this accident. The essence of the Mejias’ claim was that Worthington, as the owner/general contractor, had a duty to maintain the site in a safe condition for all workers and that Worthington had breached that duty by failing to correct, or arrange to have corrected, the dangerous condition created by Sunshine Masonry when it loaded mesh bundles onto the unbraced Hambro joists.
After a two-week trial, the jury awarded the Mejias damages in excess of $6.5 million. The jury apportioned five percent of the negligence to Mr. Mejia, ten percent to Worthington, and eighty-five percent to Sunshine Masonry. Under the applicable version of the joint and several liability statute, section 768.81, Florida Statutes (1999), Worthington was liable for ninety-five percent of the economic losses, which totaled more than $5 million. Ohio Casualty, as Worthington’s insurer, was added as a party to the lawsuit pursuant to section 627.4136(4), Florida Statutes (1999), after the jury’s verdict.
In this appeal, Worthington contends that final judgment should have been entered in its favor because the trial court should have granted its motion for directed verdict at the close of the Mejias’ case. In the alternative, Worthington contends that it is entitled to a new trial because the jury instructions given by the trial court were confusing and included incorrect statements of the law. We address each of these arguments in turn.
*83 Motion for Directed Verdict
In its first argument, Worthington contends that the trial court erred by denying its motion for directed verdict because there was no evidence that it breached any duty it owed to Mr. Mejia or that any breach was the proximate cause of his injuries. Because there was disputed evidence on these issues, the trial court properly denied this motion.
The focus of the parties’ dispute on this issue lies in the extent of the duties owed to a subcontractor’s employee by an entity that is both the owner and general contractor on a construction project. While an owner who hires an independent contractor is not generally liable for injuries sustained by that contractor’s employees, an exception to this general rule exists when the owner “has been actively participating in the construction to the extent that he directly influences the manner in which the work is performed” or has engaged in “acts either negligently creating or negligently approving the dangerous condition resulting in the injury or death to the employee.” Conklin v. Cohen, 287 So.2d 56, 60 (Fla.1973); see also Johnson v. Boca Raton Cmty. Hosp., Inc., 985 So.2d 593, 595-96 (Fla. 4th DCA 2008), review denied, 1 So.3d 172 (Fla.2009); Atl. Coast Dev. Corp. v. Napoleon Steel Contractors, Inc., 385 So.2d 676, 679 (Fla. 3d DCA 1980). Thus, an owner who is also acting as a general contractor “has the ultimate duty to maintain a construction site in a reasonably safe condition.” Griggs v. Ryder, 625 So.2d 950, 951 (Fla. 1st DCA 1993); see also Lewis v. Sims Crane Serv., Inc., 498 So.2d 573, 574 (Fla. 3d DCA 1986); Atl. Coast Dev. Corp., 385 So.2d at 679 (“Nelacar, who was the owner and general contractor and actively supervised the daily construction operations, had a duty to keep its premises safe for all the workmen on the job and will be ultimately held liable for injuries occurring on its worksite.”).
The origin of this heightened duty of an owner/general contractor is the supreme court’s decision in Conklin. In that case, Conklin was employed as a workman on a commercial building that was under construction. 287 So.2d at 58. While he was working, the scaffolding that he was standing on broke, and he fell seventeen stories to his death. Id. His widow sued multiple parties, including the owner, the architect, the engineering firm, and the worker’s compensation carrier for the contractor and subcontractor. Id. The complaint alleged that each of these entities “negligently breached their duty to provide the deceased with a safe place to work by failing to see that certain safety regulations were followed.” Id. The trial court dismissed the complaint, and the Third District affirmed. Id.
The supreme court accepted jurisdiction to address “the substantial amount of confusion which still exists regarding the Workmen’s Compensation Law and third-party tort suits.” Id. at 58-59. In addressing the potential liability of a property owner, the supreme court explained:
“[A]n employee of an independent contractor may maintain against an owner an action at law for damages suffered as a result of the latter’s negligence.” [State ex rel. Auchter Co. v. Luckie, 145 So.2d 239, 242 (Fla. 1st DCA 1962)].
The phrase “as a result of the latter’s negligence,” above means that the owner may he held liable if he has been actively participating in the construction to the extent that he directly influences the manner in ivhich the work is performed. Conversely, if the owner is a passive nonparticipant, exercising no direct control over the project, he cannot be held liable. To impose liability upon an oumer who is not an employer as de *84 fined by the [worker’s compensation] statute, one or more specific identifiable acts of negligence, i.e., acts either negligently creating or negligently approving the dangerous condition resulting in the injury or death to the employee, must be established.
Id. at 59-60 (emphasis added; footnote omitted). Thus, under Conklin, an owner who is also the general contractor, and thus by definition is actively participating in the work, may be held liable for a workman’s injuries if that workman can prove that the owner either negligently created or negligently approved of the dangerous condition that resulted in the injury or death.
Applying the law as set forth in Conldin to the facts in Mr. Mejia’s case, we note that because Worthington was an owner that was “actively participating” in the construction, it could be held hable if the Mejias could establish “one or more specific identifiable acts of negligence” committed by Worthington that resulted in his injury. Here, the Mejias presented evidence that Worthington’s project superintendent, Robert Bontrager, saw the Hambro joists flown onto the building at issue the day before the accident. Bon-trager saw the mesh bundles sitting on top of the joists, and he was aware that roll-bars had been installed around only the perimeter of the joists. He admitted that the notes for the installation of the Ham-bro joist system said that mesh bundles should not be placed on top of the joists until they were fully braced — not just braced at the perimeters; however, he denied being familiar with the notes at the time of the accident. He testified that he had seen mesh bundles placed on top of the masonry walls between the units in the past; however, he admitted that it was obvious the day before the accident that the bundles at issue were not straddling a masonry wall.
Bontrager also testified that it was not his job to look out for the safety of anyone other than Worthington employees on the jobsite. He specifically denied that Wor-thington had any responsibility to ensure that the site was safe for the subcontractors or their employees who were on the site. He also denied that he had any responsibility to ensure that the mesh bundles were safely placed on top of the joists.
In contradiction to Bontrager’s testimony, Glenn Cribbett, who was Wor-thington’s vice president of construction, testified that one of Worthington’s responsibilities was to ensure that the job-site was reasonably safe for all of the workers on the site. Cribbett testified that Worthington made sure that its project superintendents were aware of this responsibility. Cribbett also testified that the project superintendent, Bontrager, should have examined the blueprints and read the installation manual for the Hambro joist system in order to properly perform his supervisory duties. According to Cribbett, Bontrager should have been familiar with the layout of the Hambro system to understand how it was constructed. Cribbett testified that he expected his project superintendent on each job to read and be familiar with the general notes on the blueprints and floor plans and that this would include the note that dealt with the proper placement and storage of mesh on top of the Hambro joist system while it was under construction. Most importantly, Cribbett testified that if Bontrager saw the mesh bundles laying on top of the Hambro joists with rollbar installed only around the perimeter and did nothing about it before leaving for the day, then Bontrager left the jobsite in an unsafe condition. Cribbett testified that it *85 would have been acceptable for Bontrager to leave the jobsite in this condition only if he had given an instruction to a subcontractor to correct the condition before leaving.
Given this conflicting testimony, the trial court properly denied Worthington’s motion for directed verdict. A directed verdict is proper only when there is no view of the evidence or inferences properly made from the evidence that could support a verdict in favor of the nonmoving party. See Fell v. Carlin, 6 So.3d 119, 120 (Fla. 2d DCA 2009) (quoting Sims v. Cristinzio, 898 So.2d 1004, 1006 (Fla. 2d DCA 2005)). Thus, “the court must evaluate the testimony in the light most favorable to the nonmoving party and every reasonable inference deduced from the evidence must be indulged in favor of the nonmoving party. If there are conflicts in the evidence or different reasonable inferences that may be drawn from the evidence, the issue is factual and should be submitted to the jury.” Sims, 898 So.2d at 1005 (citations omitted). Because the Mejias presented some evidence supporting their position that Worthington either negligently allowed the dangerous condition to be created or negligently approved it, even if only by simply ignoring it, Worthington’s directed verdict motion was properly denied, and the case was properly sent to the jury on this issue.
As an alternative basis for reversal, Worthington contends that the Mejias did not prove that any breach by Worthington was the proximate cause of Mr. Mejia’s injury. Worthington points to evidence it presented that tended to show that the accident happened when Sunshine Masonry’s employees were using a sledgehammer to adjust the placement of one of the joists while the mesh bundles were on top of it, and Worthington contends that this was the sole proximate cause of the accident. However, the Mejias presented evidence that the joists and mesh bundles did not fall while the joist was being adjusted; instead, they fell anywhere between two and five minutes after the last strike to the joist. Because there was some evidence that the improper placement of the mesh bundles was at least a cause of the accident and resulting injury to Mr. Mejia, the trial court properly denied Worthington’s motion for directed verdict on this basis as well.
Jury Instructions
In the alternative, Worthington argues that it is entitled to a new trial because the jury instructions concerning its duty and any breach of that duty were erroneous, misleading, and confusing. Having carefully reviewed the entire trial transcript and the jury instructions given, we do not find that the trial court abused its discretion in giving these instructions.
The two challenged jury instructions given by the court read as follows:
The court has determined and now instructs you, as a matter of law, that the circumstances at the time and place of the incident complained of were such that Worthington Communities, Inc., had a duty to use reasonable care for Juan Carlos Mejia’s safety. As the owner and general contractor for the construction project, Worthington Communities, Inc., had the ultimate duty to maintain the site in a reasonably safe condition.
The first issue for your determination on the negligence claim of Plaintiff, Juan Carlos Mejia, against Defendant, Wor-thington Communities, Inc., is whether at the time and place of the incident complained of, Worthington Communities, Inc., breached its duty by failing to maintain the premises in a reasonably safe condition. And if so, whether such *86 negligence was a legal cause of loss, injury or damage to Juan Carlos Mejia.
The trial court went on to instruct the jury that a “legal cause” of loss or injury arose “if it directly and in natural or continuous sequence produces or contributes substantially to producing such loss, injury or damage so that it can reasonably be said that but for the negligence the loss, injury or damage would not have occurred.” The court also instructed the jury that negligence could be a legal cause of loss, injury or damage “even though it operates in combination with the acts of another.”
The majority of this duty instruction came directly from the case law cited by and relied upon by the parties. In Lewis, the court specifically held that an instruction that an owner/general contractor had a duty to maintain a construction job site in a reasonably safe condition was proper. 498 So.2d at 574. Moreover, the same court also noted that an owner/general contractor had the ultimate duty to maintain the site in a reasonably safe condition. Id.; see also Griggs, 625 So.2d at 951; Jupiter Inlet Corp. v. Brocard, 546 So.2d 1, 3 (Fla. 4th DCA 1988). In light of this case law, we cannot say that the trial court abused its discretion in instructing the jury in this manner.
In arguing for reversal, Worthington initially contends that the trial court should not have given the first part of the instruction, i.e., the preemptive instruction on the issue of Worthington’s duty, because it was unnecessary since Worthington did not dispute the issue of duty at trial. However, the record shows that Worthington did, in fact, vigorously contest its duty at trial. Worthington elicited testimony from witness after witness that it had no duty to supervise the job site or any of the workers and had no duty to inspect the job site for dangerous conditions. Given this testimony, the trial court needed to give some instruction to the jury on what Worthing-ton’s duty was because the issue was actually raised and disputed at trial.
Worthington next contends that the trial court should not have included the word “ultimate” in the duty instruction. We tend to agree that this language has been extended outside its proper context. In Atlantic Coast Development, the case in which this language originated, the accident at issue occurred when a load of concrete blocks fell as it was being lifted by a construction crane. 385 So.2d at 678. The court noted that a construction crane in operation is inherently dangerous. Id. at 679. The court went on to explain that the owner/general contractor had a nondel-egable duty to keep the premises safe for all workmen on the job for injuries arising out of the use of that dangerous instrumentality. Id. at 680. While the owner/general contractor could delegate the performance of its duty to keep the workplace safe to the subcontractor actually running the crane, the owner/general contractor could not delegate the liability arising from the use of that dangerous instrumentality and so it had the “ultimate” duty to keep the premises safe during the crane’s operation. Id.
The basis for the language concerning “ultimate” duty in Atlantic Coast Development was the inherently dangerous operation of the construction crane. However, without explaining why, courts have subsequently applied that language to cases that did not involve the use of dangerous in-strumentalities, such as a crane. For example, in Lewis, a worker tripped getting off a construction elevator that did not level properly. 498 So.2d at 574. In Griggs and Jupiter Inlet, workers fell off roofs. Griggs, 625 So.2d at 950; Jupiter Inlet, 546 So.2d at 2. These cases did not involve the use of dangerous instrumentalities and so did not involve nondelegable *87 duties. Nevertheless, the courts used the “ultimate” duty language from Atlantic Coast Development when describing the owner/general contractor’s duty.
We tend to agree with Worthington that it is improper to apply the “ultimate” duty language applicable to nondelegable duties outside of the context of inherently dangerous instrumentalities. However, we affirm the final judgment in this case despite this impropriety for two reasons. First, the specific argument that Lewis and its progeny were wrongly decided was not made in the trial court. Instead, Worthington argued that the court should follow Lewis when instructing the jury. As a general proposition, for an argument to be preserved for review, “an issue must be presented to the lower court and the specific legal argument or ground to be argued on appeal or review must be part of that presentation.... ” Sunset Harbour Condo. Ass’n v. Robbins, 914 So.2d 925, 928 (Fla.2005) (quoting Tillman v. State, 471 So.2d 32, 35 (Fla.1985)); see also N.L.E. v. Dep’t of Children & Family Servs., 970 So.2d 486, 489 (Fla. 2d DCA 2007) (“ ‘Except in cases of fundamental error, appellate courts will not consider an issue that has not been presented to the lower court in a manner that specifically addresses the contentions asserted.’ ” (quoting State v. Hunton, 699 So.2d 320, 321 (Fla. 2d DCA 1997))); Miller v. Miller, 709 So.2d 644, 645 (Fla. 2d DCA 1998) (holding that an appellate court “cannot address on appeal an issue not ruled upon” by the trial court). We will not hold that the trial court abused its discretion by giving a particular jury instruction when the rationale and legal authority for finding that the jury instruction was erroneous was never argued to the trial court. This is especially true here because Wor-thington actively relied on the Lewis decision rather than arguing that it was wrongly decided and asking the trial court to attempt to unravel the convoluted case law on this point.
Second, regardless of whether the case law needed unraveling, the “ultimate duty” language used in this case was not so misleading or confusing as to warrant reversal. The jury instructions, when considered as a whole, properly explain the scope of Worthington’s duty. As Conklin teaches, an owner/general contractor has a duty to keep the entire jobsite reasonably safe for all employees. To the extent that an owner/general contractor oversees the entire project and all workers on the site, it has a responsibility to ensure that no subcontractor creates a condition that poses an unreasonable danger to others on the site. The owner/general contractor cannot delegate its obligation to keep the entire jobsite safe to a single subcontractor, particularly on a construction site involving the erection of multiple multi-story buildings. Thus, while the use of the term “ultimate” may have been based on an improper extension of the language in Atlantic Coast Development, in light of the record and the instructions as a whole, the trial court’s isolated reference to an “ultimate duty” was not so misleading or confusing as to be fundamentally prejudicial to Worthington. Accordingly, Worthing-ton is not entitled to a new trial on this basis.
Conclusion
We have fully and carefully considered the numerous other arguments made by the parties in this appeal, and we find them without merit. Worthington, as the owner and general contractor of the condominium project, had a duty to maintain the site in a reasonably safe condition for all of the workers on the site. The Mejias presented some evidence tending to establish that Worthington breached this duty. The jury instructions given by the trial court, *88 when considered as a whole, were not misleading on the issues of either duty or breach. Accordingly, we affirm the final judgment entered in favor of the Mejias.
Affirmed.
SILBERMAN, J., Concurs.
ALTENBERND, J., Concurs specially with opinion.